IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| TRANSWEST CREDIT UNION,<br><br>Plaintiff,<br><br><br><br>vs.<br><br><br><br>CUMIS INSURANCE SOCIETY, INC.,<br><br>Defendant. | MEMORANDUM DECISION AND ORDER DENYING IN PART AND GRANTING IN PART PLAINTIFF'S AND DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION TO STRIKE EXHIBITS 8 & 10 WITHOUT PREJUDICE<br><br><br><br>Case No. 2:09-CV-297-TS |

This matter is before the Court on Defendant's Motion for Summary Judgment and on Plaintiff's Motion to Strike and its Motion for Summary Judgment. For the reasons discussed below, the Court will deny as moot Plaintiff's Motion to Strike. The Court will grant in part and deny in part Parties' Motions for Summary Judgment.

## I. STANDARD OF REVIEW

Summary judgment is proper if the moving party can demonstrate that there is no genuine issue of material fact and it is entitled to judgment as a matter of law.[1] In considering whether a genuine issue of material fact exists, the Court determines whether a reasonable jury could return a verdict for the nonmoving party in the face of all the evidence presented.[2] The Court is required to construe all facts and reasonable inferences in the light most favorable to the nonmoving party.[3] Once a motion for summary judgment is properly made and supported, "an adverse party may not rest upon the mere allegations or denials in his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial, and if he does not so respond, summary judgment, if appropriate, shall be entered against him."[4]

## II. STATEMENT OF FACTS

Plaintiff Transwest Credit Union ("Transwest") took out a "credit union bond" covering up to $3,000,000.00 in damages from Defendant Cumis Insurance Society, Inc. ("Cumis"). In August 2007, Transwest filed a claim of loss under the bond. At issue is whether Cumis is obligated to make payment.

---

[1] FED. R. CIV. P. 56(c).

[2] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Clifton v. Craig*, 924 F.2d 182, 183 (10th Cir. 1991).

[3] *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Wright v. Southwestern Bell Tel. Co.*, 925 F.2d 1288, 1292 (10th Cir. 1991).

[4] FED. R. CIV. P. 56(e)(2).

A. KEY LANGUAGE FROM THE BOND

Under the "coverages" section the bond states, "We will pay you for your loss resulting directly from a named 'employee's' 'failure to faithfully perform his/her trust.'" The bond's definitions section includes:

> "Failure to faithfully perform his/her trust" means acting in conscious disregard of your established and enforced share, deposit or lending policies.
>
> "Failure to Faithfully perform his/her trust" does not mean:
>     a. Negligence, mistakes or oversights; or
>     b. Acts or omissions resulting from inadequate training; or
>     c. Unintentional violation of laws or regulations; or
>     d. Unintentional violation of your policies or procedures; or
>     e. Acts or omissions known to, acquiesced in, or ratified by your Board Of Directors; or
>     f. Acts of an "employee" for which you could have made claim under Employee Or Director Dishonesty Coverage.[5]

The bond's conditions section includes the following subsections:

> 10. Discovery of Loss
>
> This Bond applies to loss discovered by you while this Bond is in effect. Discovery occurs when you first become aware of facts which would cause a reasonable person to assume that a loss of a type covered under this Bond has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred. The exact amount or details of loss may not be known at the time of discovery.
>
> Discovery also occurs when you receive notice of an actual or potential claim alleging that you are liable to a third party under circumstances which, if true, would constitute a loss under this Bond.
>
> 11. Notice of Discovery of Loss
>
> You must send us a written notice at the earliest practicable moment after

---

[5]Docket No. 18, Ex. 11, at 22.

Discovery of Loss, but not to exceed 60 days after such discovery, without regard to amount or whether the loss appears to exceed any deductible.[6]

The bond's exclusion section includes the subsection "Indirect Loss":

> Any indirect or consequential loss, including, but not limited to:
>     a. Loss or use of property; or
>     b. Diminution of value of property; or
>     c. Earnings or interest not realized by you, whether past, present or future, earned or unearned.
> However, compensatory damages sought against you for prejudgement interest, attorneys' fees or loss of use of property will not be excluded from any applicable coverage by reason of this exclusion.[7]

B.       FACTUAL BACKGROUND

From 2005 to the beginning of 2007, two Transwest employees made twenty-seven loans that are at issue in this action. The employees were the chief lending officer and the principal mortgage loan officer. The loans were all made to individuals who planned on building a new home and selling it without ever occupying it. The parties refer to these homes as "spec homes" due to their speculative nature. The loans violated several formal policies of Transwest, but it is unclear to the Court which, if any, of these policies were actually enforced. Some of the policies Transwest alleges were violated were (1) spec home loans were only to be made under Transwest's adopted policy for construction loans, and none of these loans were made under that policy; (2) the employees were required to seek approval for loans over $200,000.00 and $100,000.00 respectively, and they failed to do so; (3) loans were given to borrowers whose debt

---

[6] *Id.* at 47.

[7] *Id.* at 33.

to income ratio was over 45%; (4) income or assets necessary to qualify for loans was not verified; (5) certain debts owed by borrowers were not disclosed in the loan paperwork; and (6) preliminary underwriting was not completed until after the loans had been made.

Defendant points to three occurrences that put Plaintiff on notice of the loss during 2006. First, in March or April 2006, a state examiner inspected Plaintiff's books and verbally stated to Plaintiff's senior management his concern that Plaintiff was making speculative loans. This concern was restated and supported in the examiner's written report received by Plaintiff on May 18, 2006. Second, during the summer of 2006, Plaintiff attempted to reduce its potential loss by selling some of the speculative mortgages to another credit union in Utah. The other credit union declined to purchase the mortgages because they were speculative. Third, Plaintiff's CFO visited the construction sites of several of the spec homes at issue in July 2006 and concluded that they were indeed spec homes.

Plaintiff does not dispute these occurrences, but it claims that from mid-2006 thru 2007 it addressed the loans at issue on a case-by-case basis. On some loans, Plaintiff loaned additional funds to ensure the completion of construction. On others, it denied additional funding. Plaintiff's alleged aim was to "enhance the resale value and thus reduce the losses" of the loans.[8] According to Plaintiff, it was not until the summer of 2007 that "it became apparent" to Plaintiff that it "may suffer losses as a result of" the loans at issue.[9] However, even during summer 2007,

---

[8] Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment, at 6 (*citing* Aff. of Marc Mikkelson, at ¶ 6).

[9] *Id.* (*citing* Aff. of Paul Metcalf, at ¶ 3).

Plaintiff hoped that "the value of the security for the loans may be sufficient to satisfy the loan balances."[10]

On or about August 21, 2007, Plaintiff notified Defendant of a proof of loss. This original notice of loss only named one employee as the employee that caused the loss. It also listed the amount of the loss at $700,000.00 and the date of discovery as May 2007. On or about May 30, 2008, Plaintiff sent an amended proof of loss, which claimed the loss was $1,500,000.00. On or about August 5, 2008, Plaintiff sent a third proof of loss. This proof of loss named only the second employee as the cause of loss and listed the amount of the loss at $1,500,000.00. In the proofs of loss, Plaintiff claimed the cause of loss was due to the employees making speculative mortgage loans.

## III. DISCUSSION

An insurance agreement is a contract, and thus the terms of the contract will govern in resolving any dispute.[11] If there is any ambiguity in the contract terms, resolving such terms is a matter of law.[12] If the contract is an insurance contract, "ambiguous provisions are usually construed against the insurer without resort to extrinsic evidence, because insurance contracts are ordinarily standard forms, whose language is not negotiated by the parties."[13]

---

[10]*Id.* at 7-8 (*citing* Aff. of Paul Metcalf, at ¶ 4).

[11]*Home Sav. & Loan v. Aetna Cas. & Surety Co.*, 817 P.2d 341, 347 (Ut. Ct. App. 1991) (*citing LDS Hospital v. Capitol Life*, 765 P.2d 857, 858 n.2 (Utah 1988); *Wilburn v. Interstate Elec.*, 748 P.2d 582, 585 (Utah Ct. App. 1988)).

[12]*Id.* (*citing Village Inn Apartments v. State Farm Fire & Cas. Co.*, 790 P.2d 581, 582 (Utah Ct. App. 1990)).

[13]*Id.* (*citing LDS Hospital*, 765 P.2d at 858; *Wilburn*, 748 P.2d at 585 n.2).

A.     NOTICE AND PREJUDICE PRESENT ISSUES OF FACT

The Court notes that it is clear that notice was not given within the sixty days required by the contract because the original notice was given in August 2007, and stated the date of discovery as May 2007. Thus, the issue for the fact finder turns on whether Defendant was prejudiced.

Under Utah law "[f]ailure to give notice or file proof of loss [within the time specified in the policy] does not bar recovery under the policy if the insurer fails to show it was prejudiced by the failure."[14] This law places the burden on Defendant to show that if timely notice was not provided Defendant suffered some prejudice. Furthermore, if the matter of prejudice "could depend on a variety of factors," then it is almost certainly a matter for a fact-finder to determine.[15]

Under Utah case law, when discovery of employee dishonesty and/or loss occurs is "a relatively difficult, subjective" question—especially when the matter involves distinguishing between matters that give rise to a suspicion and confirmation of that suspicion.[16]

The primary issue in this case is whether Defendant was prejudiced by Plaintiff's failure to provide notice within the contractual sixty days of discovery. This issue involves at least two questions of fact that cannot determined on a motion for summary judgment. First is the issue of

---

[14] Utah Code Ann. § 31A-21-312(2).

[15] *See Mullin v. Travelers Indemnity Co. of Conn.*, 541 F.3d 1219, 1227 (10th Cir. 2008) (addressing an insurance contract under Utah law).

[16] *Home Savings and Loan*, 817 P.2d at 355. While *Home Savings and Loan* discusses this in the context of discovering employee wrongdoing and not loss, its language implies that the rule may be applied to either situation. *Id.*

7

whether Defendant was prejudiced by Plaintiff not providing notice until August 2007. Next, when Plaintiff discovered the loss is essential to making the determination of prejudice because it will be much easier for Defendant to meet its burden and show prejudice if Plaintiff discovered the loss in 2006 rather than 2007. Both of these issues are disputed; thus summary judgment is not proper in this matter.

B.  WHETHER THE EMPLOYEES RELIED ON SWORN STATEMENTS OR KNOWINGLY VIOLATED TRANSWEST POLICY IS AN ISSUE OF FACT

There is also a dispute as to whether the employees relied on the sworn statements in the loan application paperwork indicating that the borrowers agreed to use the new home for their personal residence. Defendant asserts that the employees had a right to rely on the sworn statements and thus the employees did not violate Transwest policy by making speculative loans, because the loans were not speculative based on the sworn statements. Plaintiff points out that the "sworn statement" involves checking a certain box on the fourth page of a loan application that is generally filled out by the Transwest employee and not seen by the borrower until it is executed at closing. Plaintiff argues that the employees knew the loans were for spec homes and that the signors were not aware they were stating the homes were to be for their personal residences.[17]

The Court finds that whether the employees violated Transwest policy by issuing the loans for speculative purposes is a question of fact to be decided at trial. There is also a dispute as to what policies were in place at the time the loans were issued, and if the policies were

---

[17] Aff. of Tamera Perkins, at 2.

enforced. This is also a question of fact that precludes summary judgment.

C. WHETHER LOSSES MAY BE OFFSET DUE TO A GENERAL DECLINE IN THE REAL ESTATE MARKET AND WHETHER LOST INTEREST IS INCLUDED IS AN ISSUE OF LAW

As stated above, under Utah law, ambiguities in an insurance contract "are usually construed against the insurer."[18] The parties dispute whether a drastic decline in the real estate market should offset any amount owed Plaintiff under the policy. This question involves interpreting the contract between the parties. Thus, it is a matter of law.

In determining whether any amount owed by Defendant may be offset by the loss due to the decline in the real estate market and in determining whether Plaintiff is owed any interest—it claims it is owed $780,400.49[19]—the Court must first look to the language of the bond.

As stated above, the bond's coverages section states, "We will pay you for your loss resulting *directly* from a named 'employee's' 'failure to faithfully perform his/her trust.'"[20] The bond's exclusion section excludes "[a]ny indirect or consequential loss, including, but not limited to: . . . b. Diminution of value of property; or c. . . . interest not realized by you, whether past, present or future, earned or unearned."[21]

Defendant cites to a case from the District of Utah dealing with a bond similar to the one

---

[18]*Home Sav. & Loan*, 817 P.2d at 346 (*citing LDS Hospital*, 765 P.2d at 858; *Wilburn*, 748 P.2d at 585 n.2).

[19]*See* Plaintiff's Motion for Summary Judgment at 69 (*citing* Second Aff. Marc Mikkelson at ¶6).

[20]Defendant's Memorandum in Support of Summary Judgment, Exhibit 11, at 1 (emphasis added).

[21]*Id.* at 33.

at issue in this case.[22] In *Direct Mortgage Co.* an employee of Direct Mortgage Co. ("Direct") falsified information on loan applications. The loans were issued, and the mortgages subsequently were sold off. The mortgage holders eventually learned of the dishonest act by Direct's employee and demanded the mortgages be bought back under a warrantee in the original sale. Direct bought back the mortgages as a means to settle a lawsuit and then filed a proof of loss with its insurance company. The issue was whether the loss was a direct or indirect loss. The Court adopted the "Direct Means Direct" approach and rejected a proximate cause standard for determining losses.[23] It held that the bond did not cover the loss claimed because the loss was due to the buy-back warrantee and the third parties' discovery of the fraud. Direct had suffered no real loss at the time of the fraud, only a hypothetical one that came to fruition after the actions of others.[24]

More on point is language from *FDIC v. United Pacific Insurance Co.*[25] In this case, the Tenth Circuit applied Utah law to a fidelity bond issue where the defendant appealed the trial court jury verdict, claiming that the loan transaction fell outside the coverage of the bonds at issue. He also argued that the plaintiff had sustained no loss in the matter. The court laid out very clear rules regarding fidelity bonds. First, it stated that the insured carries the burden of proof and

---

[22]*Direct Mortgage Corp. v. Nat. Union Fire Ins.* Co. of Pittsburgh, PA, 625 F.Supp.2d 1171 (D. Utah 2008) (Cambell, C.J.).

[23]*Id.* at 1175.

[24]*Id.* at 1177-78.

[25]20 F.3d 1070 (10th Cir. 1994).

must show by a preponderance of the evidence that it suffered an actual loss.[26]  Second, it stated something similar to the "Direct Means Direct" rule—that a direct loss "indicates a direct loss or the actual depletion of bank funds caused by the employee's dishonest acts."[27]  Third, "[i]n terms of loss with respect to the making of loans, a bank suffers a loss when funds are disbursed due to the employee's wrongful conduct. The measure of damage of the actual loss regarding a loan is the outstanding balance due on the loan."[28]  Fourth, the court quoted a Massachusetts decision and provided a string of subsequent citations to establish the proposition that the amount of loss is determined "regardless of the security the bank has for the loss, and that the 'loss' occurred and was suffered by the plaintiff, without regard to its possible remedies, when its funds in fact were diverted. . . ."[29]  Finally, the court stated that any recovery from the initial loss would offset against the loss, but it was not to be considered until actually recovered—and it was an offset that adjusted the initial loss calculation. The court held that Plaintiff had suffered an actual loss when fraudulent loans were made and that it was "more than a bookkeeping or theoretical loss."[30]

In applying the language of *United Pacific* to this matter it becomes clear that the impact of the real estate market is not a factor in determining the loss claim.  Plaintiff's loss must be determined from the time the funds were wrongfully distributed.  Conversely, any interest

---

[26]*Id.* at 1080.

[27]*Id.*

[28]*Id.* (citations omitted).

[29]*Id.* (*quoting Fitchburg Sav. Bank v. Mass. Bonding & Ins. Co.*, 174 N.E. 324, 328 (1931) (subsequent *see also* citations omitted)).

[30]*Id.* (*citing In re Schulter, Green & Co.*, 93 F.2d 810, 812 (4th Cir. 1938).

11

accrued after the initial loan was made should not be considered as part of the claim.[31] The claim amount must be determined when the money was loaned. Thus, if a fact finder does determine that money is owed under the claim, the amount of the claim will be the amount of the original loans minus any payments made or moneys recovered via foreclosure or other means.

D.      MOTION TO STRIKE

Plaintiff has moved to strike Defendant's exhibits eight, the state examiner's report, and ten, the loan applications. While this Order references both of these exhibits in the statement of facts, it does not rely on either of them in making its determinations. The issues of fact are plain with or without these exhibits. Furthermore, the exhibits have no impact on the Court's interpretation of the contract. Consequently, the Court need not consider the merits of the Motion to Strike and denies it as moot.

## IV. CONCLUSION

Material issues of fact exist as to whether Plaintiff is barred from recovering under the bond because of untimely notice which prejudiced Defendant and whether Plaintiff's employees' conduct was sufficient to meet the requirements for a claim of loss according to the bond. In determining the amount of the claim the parties shall not consider interest owed on the loans nor the decline in the housing market.

---

[31]However, if Plaintiff is seeking interest from Defendant from the time that Plaintiff filed a claim against Defendant (prejudgment interest), and a fact finder finds in favor of Plaintiff, then Defendant may owe the amount the fact finder will determine for the claim plus prejudgment interest which is specifically allowed under the bond.

It is therefore

ORDERED that Plaintiff's and Defendant's Motions For Summary Judgment (Docket Nos. 17 & 28) are Denied in Part and Granted in Part as explained above. It is further

Ordered that Plaintiff's Motion to Strike Exhibits 8 & 10 (Docket No. 22) is Denied as moot.

Per the Court's standard practice, the parties will be referred to a settlement conference by separate order.

DATED   September 21, 2010.

BY THE COURT:

_____
TED STEWART
United States District Judge